## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| JAMES COLVIN,<br><br>       Plaintiff,<br><br>   v.<br><br>TRAVIS DAY, JUAN MARTINEZ, LESLIE WHEAT, KEVIN LUPER, DOUG BROOKS, and JULES HEBERT, *in their official and individual capacities*,<br><br>       Defendants. | CIVIL ACTION NO.:<br><br>JUDGE:<br><br>MAGISTRATE JUDGE: |

## COMPLAINT

## STATEMENT OF CLAIM

Plaintiff is incarcerated at Rayburn Correctional Center in the custody of the Louisiana Department of Corrections ("DOC"). As a prisoner, he is entirely dependent on Defendants for his basic health care. However, the health care Defendants provide falls short of constitutional minimums and fails to meet his basic needs, leaving painful and harmful medical conditions unaddressed or inadequately addressed. Accordingly, Plaintiff seeks declaratory and injunctive relief, as well as compensatory damages against Defendants for violations of his constitutional rights under the Eighth Amendment and his statutory rights under the Americans with Disabilities Act ("ADA") and the Rehabilitation Act, and for their negligence under Louisiana state law.

## JURISDICTION AND VENUE

1. Plaintiff brings this action under the Eighth Amendment to the United States Constitution, 42 U.S.C. §§ 1983, 12101 *et seq.*, and 1988.

2. The Court has jurisdiction over Plaintiffs' federal claims pursuant to 42 U.S.C. § 1331 (federal question), § 1343 (civil rights), and § 2202 (Declaratory Judgment Act). A declaration of law is necessary to determine the rights and duties of the parties.

3. Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) because the events or omissions giving rise to Plaintiffs' claims occurred in the Eastern District of Louisiana.

4. Plaintiff JAMES COLVIN, DOC No. 102498, is a 70-year-old Louisiana resident incarcerated at B.B. Rayburn Correctional Center ("Rayburn") in Angie, Louisiana. He is a person with a disability. *See* 42 U.S.C. §12102. Mr. Colvin has a pacemaker, which substantially limits the operation of his cardiovascular system, a major bodily function. He also has a neurogenic bladder and an implanted neurostimulator, without which he is unable to void his bladder.

## PARTIES

5. Defendant TRAVIS DAY is the warden at Rayburn and an agent and official representative of the DOC. In this capacity, he exercises operational control over the prison by making various management and administrative decisions; he is the prison's policymaker. By law, he is responsible for protecting the constitutional rights of all persons held in Rayburn. He is sued in his official capacity for injunctive and declaratory relief. He is sued in his individual capacity for damages. He can be served at 27268 Highway 21 North, Angie, Louisiana, 70426.

6.  Defendant JUAN MARTINEZ is the medical director at Rayburn and an agent and official representative of the DOC. In this capacity, he is responsible for overseeing the delivery of health care at the prison and the infirmary, reporting directly to Warden Day. He is sued in his official capacity for injunctive and declaratory relief. He is sued in his individual capacity for damages. He can be served at 27268 Highway 21 North, Angie, Louisiana, 70426.

7.  Defendant LESLIE WHEAT is the director of nursing at Rayburn and an agent and official representative of the DOC. In this capacity, she is responsible for providing health care at the prison and the infirmary, reporting directly to Martinez. She is sued in her official capacity for injunctive and declaratory relief. She is sued in his individual capacity for damages. She can be served at 27268 Highway 21 North, Angie, Louisiana, 70426.

8.  Defendant KEVIN LUPER is an assistant warden at Rayburn and an agent and official representative of the DOC. In this capacity, he is in charge of security at the facility and implementing security policies set and dictated by Warden Day. He is sued in his official capacity for injunctive and declaratory relief. He is sued in his individual capacity for damages. He can be served at 27268 Highway 21 North, Angie, Louisiana, 70426.

9.  Defendant DOUG BROOKS is a correctional lieutenant at Rayburn and an agent and official representative of the DOC. In this capacity, he maintains security at Rayburn, reporting directly to Assistant Warden Luper. He is sued in his official capacity for injunctive and declaratory relief. He is sued in his individual capacity for damages. He can be served at 27268 Highway 21 North, Angie, Louisiana, 70426.

10. Defendant JULES HEBERT is a correctional lieutenant at Rayburn and an agent and official representative of the DOC. In this capacity, he maintains security at Rayburn, reporting directly to Assistant Warden Luper. He is sued in his official capacity for injunctive and declaratory relief. He is sued in his individual capacity for damages. He can be served at 27268 Highway 21 North, Angie, Louisiana, 70426.

## FACTUAL ALLEGATIONS

11. James Colvin is serving an 80-year prison sentence after being found guilty of a first-offense armed robbery committed when he was 28 years old. Colvin robbed a grocery store using an inoperable replica of a Civil War firearm that was covered in tape.

12. Colvin began serving his sentence on July 27, 1982, and he has presently been incarcerated for 42 years.

13. In late 2017, Colvin was transferred to Rayburn, and he has spent the last 7 years serving his sentence at the prison.

14. Colvin is presently 70 years old and suffers from a variety of medical problems, including a history of diverticulitis; Type 2 diabetes; colitis; coronary artery disease; and anal dysplasia.

15. On January 17, 2020, Colvin was sent to University Medical Center ("UMC") after developing bladder problems that caused him to be unable to void it.

16. Doctors at UMC diagnosed Colvin with a neurogenic bladder and recommended a process called sacral neuromodulation, which involves implantation of an electronic device to assist with urination. Colvin agreed to the procedure.

17. On February 10, 2020, UMC doctors began stage one of the procedure, which was a success. The doctors implanted above his left hip an "Interstim" device, which is operated using an external controller that stimulates the bladder.

18. After the implantation, Colvin met with a representative of Medtronic, the company that manufactured the bladder device, to receive instructions.

19. The Medtronic representative informed Colvin that strong sources of electromagnetic interference ("EMI") can affect the operation of the neurostimulator, causing the components of the implanted device to heat up, damage surrounding tissue, and cause serious injury or death. Such EMI exposure can also cause the device to malfunction, changing its settings and requiring it to be reprogrammed.

20. Because walking through security gates—including those used at Rayburn—can cause such serious problems, the Medtronic representative issued him a patient identification card. Colvin was advised to show the pass to security and request a manual search whenever he was asked to pass through a security gate.

21. Upon information and belief, Medtronic representatives and UMC staff communicated this warning to Rayburn's medical staff.

22. On February 17, 2020, Colvin returned to UMC for the second stage of the procedure to install ion batteries in his lower back to power the implanted device.

23. During the procedure, Colvin went into anaphylactic shock. He developed throat swelling, urticarial rash, itching, and hypotension. He was admitted overnight, his symptoms resolved, and he was discharged the following day.

24. On February 18, 2020, doctors recorded the following caution in his medical records: "He needs to have his bladder stimulator controller with him at all times."

25. Upon information and belief, UMC medical staff communicated this warning to Rayburn's medical staff.

26. The remote-control device (the "controller") is a device adapted from a Samsung cellular telephone that could not be operated as a telephone.

27. Upon Colvin's return to Rayburn, security staff at the prison confiscated the controller, saying that it looked like a cellular telephone.

28. Because the controller was confiscated, Colvin was forced to catheterize himself several times a day in order to urinate, eventually causing more than 30 bacterial infections and permanent disfigurement of his penis.

29. In summer 2020, Rayburn staff returned the controller to Colvin after Warden Day received a written guarantee from Medtronic that it could not be made into a cellular telephone or communications device.

30. Medtronic informed Warden Day that the controller does not operate as a telephone. It has no Internet connection and operates using Bluetooth technology. Although it has a built-in Wifi direct "hotspot," the device cannot connect to a local device without a password. It has no application installed for making telephone calls, and a Medtronic security program would block any attempt to "crack" the controller.

31. Meanwhile, Colvin continued to suffer from his various medical conditions, including fainting spells that began in summer 2021.

32. The implanted neurostimulator continued to malfunction, waking him up in the night with severe pain in his buttocks.

33. On November 1, 2022, UMC doctors investigated Colvin's complaint and discovered the implanted device had higher, incorrect settings. UMC doctors requested that he be allowed to manually adjust the settings using the controller.

34. On December 7, 2022, UMC doctors installed a second Medtronic device designed to regulate his heart rate, a pacemaker. Medtronic issued Colvin a "communicator" that collects data from the pacemaker via Wifi then relays it through a cellular transmission to a cardiologist at UMC.

35. Data from the pacemaker showed that the electronic lead inserted into the lower chamber of Colvin's heart was loose. UMC doctors resolved to monitor the device closely but did not want to remove it for fear of infection.

36. Rayburn's security staff has forced Colvin to walk through security gates several times, including twice in the summer of 2023, deliberately exposing him to the risk of harm despite their knowledge of the implanted device.

37. Each time that he was ordered to pass through a security gate, Colvin protested, tried to present his patient information card, and warned staff that he could suffer severe injury. Prison staff ignored his pleas and forced him to comply.

38. In summer 2023, Lt. Brook Thomas commanded Colvin to pass through the security gates despite his knowledge that doing so could cause severe injury. After Colvin passed through the gate, he experienced intense burning and pain that persisted for months.

39. On June 28, 2023, UMC doctors replaced the Interstim bladder stimulator because it was malfunctioning, removing the originally implanted device and implanting a newer model. Medtronic also issued Colvin a newer, improved controller.

40. On October 26, 2023, Colvin called an out-of-state friend using the prison's telephone system. He asked the friend, Kathleen Coskran, to contract Medtronic and request the Wifi password to the pacemaker device.

41. Master Sgt. Patrick Magee was monitoring the telephone call and immediately charged Colvin with a violation of prison rule 30C, claiming he was trying to gain unauthorized access to a medical device. Assistant Warden Luper ordered Colvin to be arrested and placed in investigative segregation.

42. On the afternoon of October 26, 2023, Rayburn correctional staff tackled Colvin, confiscated his controller, and placed him in investigative segregation.

43. Colvin expected that the controller device would be returned to him once the disciplinary charges were adjudicated.

44. Colvin was never found guilty of the charged violation, and the alleged disciplinary violation was never adjudicated.

45. Defendant prison officials did not return the controller device to Colvin's possession, ending a period of about nine months during which Colvin was permitted to carry it on his person at all times and enjoyed unrestricted access to it.

46. On November 9, 2023, Colvin was ordered to go to the infirmary, where he was met by Defendant Juan Martinez. Dr. Martinez informed Colvin that he would be permitted to visit the infirmary at scheduled times to use the controller to urinate, and that he would otherwise not have access to the controller.

47. Dr. Martinez claimed that he called Medtronic and a company representative informed him that the controller could be "popped" and used as a telephone.

48. Colvin informed Dr. Martinez that Medtronic had already sent Warden Day a written guarantee that the controller could not be used as a telephone.

49. On the next day, November 10, 2023, Colvin began the process of filing a grievance following the established procedure, known as an "Administrative Remedy Procedure" ("ARP"), by drafting a statement detailing his complaint at being denied access to the controller.

50. Colvin filed the ARP on or about December 7, 2023.

51. The ARP was received by Warden Day's office on December 11, 2023.

> On January 18, 2024, Warden Day issued the written disposition denying his request for remedy. It stated:
> On October 27, 2023, the facility physician, Dr. Juan Martinez, spoke with technical support at Medtronic. They informed Dr. Martinez that per their IT Department it is not possible to remove the Wifi capability. It was suggested that you be given access to the Smart programmer each time you need to voice. Micael Chandra D.O., LSU Urology PGY-2 sent an e-mail on November 2, 2023, requesting for you to be able to visit the infirmary as needed to adjust the settings on the device. The same day Lesley Wheat, DON sent nursing staff an email advising them you are allowed to go to the infirmary as needed to use the stimulator. Your duty status was updated to include: may enter Infirmary before meals and at bedtime to access urinary neurostimulator implant device.
> You are being provided medical care per doctor recommendation while also ensuring your safety and the safety of others.
> Your request for remedy is denied.

52. Colvin appealed the denial, proceeding the "second step" of the ARP process. Colvin sent it via the prison mail system on January 19, 2024. It was received by Warden Day's office on January 30, 2024.

53. On Feb. 9, 2024, Colvin received a memorandum from Assistant Warden Luper, which stated:

> I was part of the decision as to who, what , when, where and you were to use the stimulator, Warden Day past [sic] on that information to you. I have not told or sent a memo/email to anyone to change that. I do know that Lesley Wheat, DON did notify her staff to monitor your use to ensure it was working as intended and as to how

many time a day you needed to use it. That is a medical issue and nothing to do with security.

54. On March 18, 2024, DOC issued the final written disposition of the ARP, again denying Colvin's request. The "second step" denial stated:

> It has been determined that your complaint is without merit. The medical staff has addressed your concerns in an appropriate manner and in accordance with the DOC Health Care Policy. As indicated in the first step response, medical staff were informed that you were to be allowed to enter the infirmary as needed to use the stimulator and your duty status was updated to include: may enter infirmary before meals and at bedtime to access urinary neurostimulator implant device. Medical opinion is controlling. There is nothing else that can be added to make this issue any clearer. As such, this office has accepted staff's position in this matter and concurs with the response provided at the first level. Therefore, administrative intervention is not forthcoming.

55. Colvin received the denial on March 27, 2024.

56. The "second step" response form was signed by an unknown DOC official. It states that a "qualified member of the Headquarters staff" reviewed the ARP to "render a fair and impartial response."

57. Despite Rayburn officials' written response, Colvin is routinely denied access to the bladder-implant controller, either because Rayburn Defendants refuse to allow him to access the infirmary, refuse to allow him to use the controller at the infirmary, or because they turn him away from the infirmary or otherwise deny his attempts to void his bladder when the need arises.

58. Additionally, Colvin's need to urinate does not correspond to the prison's circumscribed timetable. "Before meals and at bedtime" effectively means about 3 to 4 times a day, which is medically insufficient. Colvin typically needs to urinate 6-8 times per day. Meals are served at about 5:30 a.m., noon, and 5 p.m.; bedtime is a 10:30 p.m.

59. For Colvin to use the controller at the infirmary requires that: he must get dressed in uniform and notify a correctional officer to request permission to leave his dorm; an escort must be arranged, depending on the time of day. He must again obtain permission at the Rain Gate; the escorting officer must accompany Colvin from his cell across the prison to the infirmary; an infirmary nurse must locate the controller and provide it to another officer; the supervising officer must then accompany Colvin into a four-by-four bathroom and observe the device (and Colvin) while he urinates. The trip is about a half-mile and the process takes about 30 minutes.

60. On July 8, 2024, undersigned counsel sent a letter to Warden Day on Colvin's behalf, notifying him that Rayburn's treatment of Colvin violated the ADA and requested that the prison permit Colvin continuous access to the controller.\

61. On July 23, 2024, Colvin again visited UMC, where a doctor examined his bladder with a scope and determined that it had been damaged from having been overfull without sufficiently frequent voiding.

62. On August 13, 2024, while he was in the prison "yard" with a group of other incarcerated men, Colvin passed out from an apparent cardiological event. Rayburn correctional officers found him unresponsive after urinating on himself. They revived him and charged him with intoxication without evidence.

63. On August 19, 2024, DOC ADA Coordinator Sharita Spears responded in writing, stating that the controller is required for calibration of the implant but that Colvin does not require it for urination. She stated, erroneously, that the implant was effectively meeting his needs, allowing him to use the restroom without constant access to the remote.

64. Spears also stated that Medtronic representatives confirmed the controller is a modified Samsung cellphone specifically designed for programming the implant, and it maintains the capacity to make emergency calls in accordance with federal laws; if the device were "altered," she wrote, erroneously, that it could be "reverted to a standard cellphone."

65. Spears also stated, erroneously, that medical personnel had confirmed Colvin was able to use the restroom without the remote and that the implant's current programming was sufficient.

66. In reality, Colvin had not been permitted access to the controller in months; he had turned it off because he was not able to use it and did not want to suffer additional malfunction or pain as a result of being forced through a security gate with EMI.

67. On August 27, 2024, Spears held a Zoom meeting with Colvin, during which she demanded that he activate the implant using the controller but leave it in the infirmary. He explained that the device malfunctions when exposed to EMI, and that prison staff previously forced him through a security gate, causing pain and a malfunction, therefore he would not leave the device turned on. Spears assured Colvin that he would not be forced through another security gate and exposed to EMI.

68. Also on August 27, 2024, Rayburn officials adjudicated the intoxication charge and found Colvin guilty—without evidence—and sent him to disciplinary segregation for 60 days. His access to the infirmary was again restricted.

69. On about October 26, 2024, Rayburn correctional officers including Lt. Doug Brooks again forced Colvin to walk through the security gate.

70. On October 29, 2024, Colvin was released from segregation to general population.

71. Colvin often fails to void successfully because he cannot access the controller. Defendant prison officials routinely deny him access to the controller, prevent him from using it properly, or delay access for so long that Colvin urinates on himself.

72. By and through the contact described above, Defendant prison officials subjected Colvin to discrimination under the ADA/RA as well as cruel and unusual punishment.

73. By and though their procedures, Defendant prison officials have developed a policy whereby persons with disabilities are treated differently solely on account of their disability.

74. By and though their procedures, Defendant prison officials have developed a policy whereby Colvin is subjected to cruel and unusual punishment.

75. Instead of providing Colvin with his requested accommodation, Defendant prison officials chose to respond by outright denying Colvin's request and retaliating against him for exercising his rights and requesting an accommodation.

76. In addition to failing to provide a needed reasonable accommodation, Defendant prison officials refused and/or failed to engage in a dialogue or otherwise work with Colvin to develop an alternative accommodation.

77. By and through their conduct, Defendant prison officials limited a qualified individual with a disability in the enjoyment of rights, privileges, advantages or opportunities enjoyed by others incarcerated at Rayburn.

78. Defendant prison officials made an intentional choice to deny Colvin's request for reasonable accommodation.

79. Defendant prison officials had notice of Colvin's disability, limitations, and need for accommodation but nonetheless chose to deny his request for reasonable accommodation.

80. By and through the actions set forth above, Defendant prison officials committed "intentional discrimination" as that phrase is understood under Fifth Circuit case law.

81. Defendant prison officials also have taken various actions against him in retaliation, including lodging bogus disciplinary charges of intoxication against him, ordering him into segregation, confiscating his art supplies, and seizing his mail.

82. For example, in early January, a lieutenant confiscated Colvin's art supplies from his locker. A gym supervisor informed him that the materials were in Defendant Luper's trash can and that Colvin would never be allowed to paint at Rayburn again.

83. On the night of Feb. 3, 2024, a corrections officer passing Colvin's bed in the dormitory stopped and told him he looked unwell. Without evidence, Colvin was accused of intoxication and taken from his cell. He was told to go through the same security gate that caused his device to malfunction previously. Colvin protested, and he was stripped and kept in a cell overnight.

84. In the morning, Defendant Hebert ordered Colvin to pass through the security gate and forced him through it three times, causing the device to overheat and shock Colvin. When he checked the controller at the infirmary later, he saw that the device's programming had been disrupted by the EMI exposure.

85. Defendant Hebert told Colvin that he would find drugs on him "next time," threatening to plant contraband on him. Defendants have never found drugs on Colvin.

86. Since that incident, Colvin's intoxication charge was adjudicated by the prison's disciplinary board. He was found guilty without evidence and punished with a 30-day suspended sentence in administrative segregation.

87. Defendant Hebert also seized items from Colvin including a plastic cup, a piece of leather, and a piece of tape and charged him with possession of contraband.

88. Additionally, Colvin's friend mailed a manuscript to him at Rayburn on or about Jan. 6, 2025, and Defendant Day has refused to release it to Colvin, claiming that it is being screened for contraband. As of this filing, Colvin has not received the manuscript.

89. These disciplinary actions, including the false charges of intoxication and contraband, as well as the seizure of his property and punishment, are retaliatory actions taken in response to Colvin asserting his legal rights.

90. Colvin has suffered the following compensable damages: physical injury and pain; emotional distress; isolation; loss of opportunity; and invasion of his civil rights.

91. These harms, including the violations of Colvin's civil rights and the physical damages resulting from his denied access to the controller, are ongoing.

## CAUSES OF ACTION

### COUNT ONE
### Americans With Disabilities Act,
### Americans With Disabilities Act Amendment Act, and Rehabilitation Act
*against all Defendants*

92. Plaintiff hereby reincorporates all of the above paragraphs and allegations of this Complaint as though fully set forth herein.

93. The ADA prohibits public entities, including Rayburn, from denying "a qualified individual with a disability … the benefits of the services, programs, or activities of the public entity" because of the individual's disability. 42 U.S.C. § 12132.

94. Defendant Rayburn is responsible for all violations of the ADA committed by hired and contracted medical staff at Rayburn.

95. The ADA defines "a qualified individual with a disability" as a person who suffers from a "physical or mental impairment that substantially limits one or more major life activities," including but not limited to, "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12101(1)(A), (2)(A).

96. Plaintiff is a qualified individual with a disability as defined in the ADA, as he has a physical impairment that substantially limits one or more major life activities.

97. The programs, services, and activities that Defendants provide to prisoners include, but are not limited to: sleeping; eating; showering; toileting; exercising; safety and security; administrative, disciplinary, and classification proceedings; medical, mental health, and dental services; educational, vocational, substance abuse and other classes; and discharge services.

98. Defendants' programs, services, and activities are covered by the ADA.

99. Under the ADA, Defendants must provide incarcerated people with disabilities reasonable accommodations and modifications so that they can avail themselves of an participate in all programs and activities offered by Defendants.

100.    Defendants fail to accommodate Plaintiff by:

   a. failing to "ensure that inmates or detainees with disabilities are housed in the most integrated setting appropriate to the needs of the individuals," 28 C.F.R. § 35.152(b)(2);

   b. failing or refusing to provide Plaintiff with reasonable accommodations and other services related to his disability, see generally 28 C.F.R. § 35.130(a);

   c. denying Plaintiff "the opportunity to participate in or benefit from [an] aid, benefit, or service" provided by Defendants, 28 C.F.R. § 35.130(b)(1)(i);

d.  failing to make "reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability," 28 C.F.R. § 35.130(b)(7);

e.  filing to "maintain in operable working condition those features or facilities and equipment that are required to be readily accessible to and usable by persons with disabilities by the" ADA, 28 § C.F.R. 35.133(a); and

f.  failing to "furnish appropriate auxiliary aids and services where necessary to afford individuals with disabilities … an equal opportunity to participate in, and enjoy the benefits of, a service, program, or activity of a public entity," 28 C.F.R. § 35.150(b)(1).

101.    Defendants fail to accommodate Plaintiff by refusing to allow him access to the Interstim device, which prevents him from urinating regularly.

102.    This failure to accommodate Plaintiff's disability also prevents Plaintiff from participating in and accessing prison programs such as educational classes and church.

103.    As a result of Defendants' discrimination against and failure to provide reasonable accommodations to Plaintiff, he does not have equal access to prison activities, programs, and services for which he is otherwise qualified.

104.    At all times relevant to this action, Rayburn was the recipient of federal funding within the meaning of the Rehabilitation Act. As a recipient of federal funds, the prison is required to reasonably accommodate prisoners with disabilities in the facility, program, activities, and services, and to provide a grievance procedure.

105.    Plaintiff is a qualified individual with a disability under the Rehabilitation Act.

106.    By their policies and practices of discriminating against and failing to reasonably accommodate prisoners with disabilities, Defendants violate Section 504 of the Rehabilitation Act, 29 U.S.C. § 794.

107.    As a result of Defendants' discrimination against and failure to provide reasonable accommodations, Plaintiff does not have equal access to prison activities, programs, and services for which he is otherwise qualified.

108.    Defendants' methods of administration as described in this Complaint subjects individuals with disabilities to discrimination on the basis of disability, in violation of both the ADA, 28 C.F.R. § 35.130(b)(3), and the Rehabilitation Act. Section 504's regulations prohibit recipients of federal financial assistance from "utilizing criteria or methods of administration … (i) that have the effect of subjecting qualified handicapped persons to discrimination on the basis of handicap [or] (ii) that have the purpose or effect of defeating or substantially impairing accomplishment of the objectives or the recipients program with respect to handicapped persons." 28 C.F.R § 35.130(b)(3)(i)-(iii).

109.    By depriving Plaintiff of adequate medical equipment, Defendants are "defeating or substantially impairing accomplishment of" the provision of constitutionally adequate medical care to Plaintiff. That failure has a more harmful impact on persons with disabilities and therefore has the effect of discriminating on the basis of disability.

### COUNT TWO
### Conditions of Confinement under the Eighth and Fourteenth Amendment
*against all Defendants*

110.    Plaintiff hereby reincorporates all of the above paragraphs and allegations of this Complaint as though fully set forth herein.

111.    By their policies and practices described herein, Defendants subject Plaintiff to a substantial risk of harm and injury from inadequate medical care. These policies and practices have been and continue to be implemented by Defendants and their agents,

officials, employees, and all persons acting in concert with them under color of law, in their official capacities, and are the proximate cause of the Plaintiff's ongoing deprivation of rights secured by the U.S. Constitution under the Eighth Amendment.

112.    Defendants have been and are aware of the deprivations complained of herein, and they have condoned or been deliberately indifferent to such conduct.

## COUNT THREE
### First Amendment Retaliation
*against all Defendants*

113.    Plaintiff hereby reincorporates all of the above paragraphs and allegations of this Complaint as though fully set forth herein.

114.    The First Amendment prohibits adverse governmental action taken against individuals in retaliation for their protected speech.

115.    Plaintiffs was engaged in protected First Amendment activities when requesting assistance with his medical needs, discussing the controller and implant, and communicating with Defendant prison officials and his attorney about his medical problems and disciplinary action against him.

116.    Defendants engaged in adverse action by, among other things, restricting Plaintiff's access to the controller, by erroneously charging him with disciplinary offenses he has not committed, by placing him in segregation, and by revoking his painting materials.

117.    Defendants' actions were motivated by and taken in retaliation for Plaintiff's speech and not for any legitimate government reason.

118.    Accordingly, Defendants violated Plaintiff's free-speech rights under the federal

Constitution.

## COUNT FOUR
### Negligence
*against Defendants Martinez, Wheat, Brooks, and Hebert*

119.    Plaintiff hereby reincorporates all of the above paragraphs and allegations of this

Complaint as though fully set forth herein.

120.    Because Plaintiff is an incarcerated person with a disability, he is unable to

provide himself with proper medical care and relies entirely on Rayburn's staff for his

medical needs.

121.    Defendants owe Plaintiff a standard of reasonable care to ensure that he does not

sustain bodily injury.

122.    Defendants breached that standard of care by:

   a. refusing him reasonable access to Infirmary so that he can urinate as needed
      using the Interstim device;
   b. refusing him reasonable access to the Interstim device so that he can urinate
      as needed; and
   c. forcing him to walk through electromagnetic detection equipment that
      caused his implanted medical device to malfunction.

123.    Defendants are liable to Plaintiff for failing to maintain a reasonable standard of

care.

## ATTORNEYS FEES AND COSTS

124.    Pursuant to 42 U.S.C. § 1988, Plaintiff is entitled to recover attorneys' fees and

costs. Plaintiff also requests attorneys' fees and costs, and expenses against Defendants

for the ADA and Rehabilitation Act claims, pursuant to 42 U.S.C. § 12205 and 29 U.S.C.

§79a.

125.    Plaintiff has no adequate remedy at law to redress the wrongs he has suffered, and

continues to suffer, as described in this Complaint, Plaintiff has suffered and will

continue to suffer irreparable injury as a result of the unlawful acts, omissions, policies,

and practices of Defendants, as alleged herein, unless Plaintiff is granted the relief he

requests. The need for relief is critical because the rights at issue are paramount under the

United States Constitution and the laws of the United States.

## PRAYER FOR RELIEF

WHEREFORE, on the basis of the foregoing, Plaintiff prays that this Court grant the following:

A.    Compensatory damages;

B.    Declaratory and injunctive relief, as set out in this Complaint;

C.    Enjoin Defendants, their agents, employees, officials, and all persons acting in
concert with them under color of state law, from subjecting Plaintiff to the
illegal and unconstitutional conditions, acts, omissions, policies, and practices
set forth herein;

D.    Order Defendants, their agents, employees, officials, and all persons acting in
concert with them under color of state law, to develop and implement, as soon
as practical, a plan to eliminate the substantial risk of serious harm that
Plaintiff suffers because of Defendants' inadequate medical care, including
but not limited to granting Plaintiff routine, reasonable access to the Interstim
device.

E.    Enjoin Defendants, their agents, employees, officials, and all persons acting in
concert with them under color of state law, from retaliating against Plaintiff in
any manner from filing this Complaint;

F.  Find that Plaintiff is the prevailing party in this case and award him attorneys' fees, court costs, expert costs, and litigation expenses under 42 U.S.C.

G.  Grant any other equitable and additional relief as appears reasonable and just, to which Plaintiff may be entitled.

126.    Plaintiff states any and all other causes of action may become known through a trial of this matter on its merits against any and all other parties which are herein named or which may be added later, and request any and all other damages or remedies which this court may deem equitable.

127.    Plaintiff reserve the right to notice of defect to this pleading and reserve the right to amend or supplement this Complaint after discovery of any additional fact, law, or claim, the amendment of which to be performed by the filing of any subsequent pleading.


**PLAINTIFF REQUESTS A TRIAL BY JURY ON ALL ISSUES SO TRIABLE**

Respectfully submitted by:

/s/ *Bruce Hamilton*
Bruce Hamilton, La. Bar No. 33170
Warfield Hamilton Law, LLC
725 Hagan Avenue
New Orleans, Louisiana 70119
Telephone: (504) 507-0816
Email: WarfieldHamiltonLaw@Gmail.com

*Counsel for Plaintiff*